We'll hear argument this morning in Case 11-1347, Chafin v. Chafin. Mr. Manili. Mr. Chief Justice, and may it please the Court, United States courts have the power to effectuate relief in the Hague Convention cases under circumstances presented here in this international treaty. Sgt. First Class Chafin's appeal from the District Court's decision is not moot because reversal of the District Court's judgment could grant Sgt. Chafin relief in three ways, each sufficient to preclude mootness. First, a reversal would mean that the United States is the child's habitual residence. Second, the District Court or court of appeals should order Ms. Chafin to bring the child back to the United States and overturn the monetary award. And third, it would effectuate relief in the ongoing Alabama case and the Scottish case by, one, letting Alabama courts proceed to determine custody, and, two, cause the Scottish court to stay or dismiss its proceeding. Ginsburg Why would it make any difference? Once the decision, the District Court decision is vacated, then the State court can go forward. There's nothing that inhibits it from doing so. There's no Federal court order. So your third point, I think, is correct. Under the UCCJEA, which is what the State of Alabama would use, there is a home State requirement that the child must be present at least six months before the action is commenced. Not so much from the District Court order, but coming down from the Alabama Supreme Court, but premised upon the original District Court order, it was determined that Alabama was not the home State of the child. So it's sort of like the traffic light that we talk about in our brief. It would allow the Alabama courts to say — Ginsburg Yes. So how would the six months be satisfied? It would toll. Because the child, we would argue, is wrongfully in Scotland based upon an error. But you can argue that on the basis of the vacation of the District Court's hate convention order. You're not inhibited by anything, as far as I can see, that the Federal court has done, since it's been vacated. It says, no, it never happened. Except for the fact that there is an error in the determination of habitual residence. And I understand what you're saying. But the rest of the controversy needs to be brought back here. That would be the appropriate remedy here, so that we have not only the habitual court determination or habitual residence determination in the District Court because of reversal, but that we have the child brought back here. And then that's the case. Ginsburg You don't have that individual residence, habitual residence determination. It says it's been wiped out. Yes, Your Honor, I understand. What our argument is, is that there is an ability to grant a remedy here, and that is the reversal of that determination, so that we go back to habitual residence in the United States. That's what avoids mootness in this case. There is a remedy that can be provided here. It is not impossible. Sotomayor What you're saying is the return of the child essentially back to Alabama. Bring the child back, yes, Your Honor. And so once the child is back in Alabama, that's the remedy. Then the State court would be seized of jurisdiction sufficient then to determine the habitual residence. Yes, Your Honor. Sotomayor Whatever the State, well, presumably the child only comes back if you win. Yes. Sotomayor So presuming you win, the child would come back and the Alabama courts could then seize the custody determination. Right. And the Alabama court would not have jurisdiction if the child had been wrongfully removed? Is that what you're saying? No. The Alabama court would have jurisdiction under the UCCJEA presently, unless this court should determine that it is moot when a child is removed from the boundaries of our nation. Wait, wait, wait. The opinion below has been vacated. So there's nothing which says that this child, this child's habitual residence was in the U.K. Yes, sir. That being the case, the only question is, will the Alabama court proceed, even assuming that it finds the child's habitual residence was in Alabama, would it proceed even if the child had been taken out of the jurisdiction? And I understand that it would. If there never had been a district court determination in the first place, certainly in this Court. There hasn't been. There hasn't been. It's been vacated. It's as though it never happened. The posture below is that the Eleventh Circuit vacated the opinion in February, but as recently as July of this year, the Alabama Supreme Court said, well, since the matter was determined moot, then only the divorce can proceed. What we hope to do is, by going back down to the Eleventh Circuit, obtaining a reversal. Well, that's bad law. You mean the Alabama court is bound by a vacated decision of a Federal court? My goodness, I never heard of anything like that. Yes, sir. Was there reasoning that the child was initially removed properly because there had been an order permitting the mother to go? Yes. So it was a lawful removal at that moment? At that moment, yes. And by reversal. What you're saying is since the case is moot, nothing has vacated the order, but it didn't make her action illegal? Correct. And by reversing, then, we're going back to what was argued to make the case moot in the first place. We can bring the child back, and we're reversing the decision. When you say bring the child back, there's an impediment to that, because now the court in Scotland has told her, don't the child stays here. There's an order that the child not be removed from Scotland. And there's also, doesn't the mother have — wasn't this mother deported? So if she — if she — the mother comes back into the United States, she's committing a criminal offense? Yes, Your Honor. Absent — and she was present at the trial in the district court. So there are provisions that would allow her to return for that particular reason. And, of course, she can reapply, I think, after something like 5 years. She was deported because she had overstayed her visa. But what about the order of the court in Scotland? The order of the court in Scotland, we would refer to it on a state level as being a standing order. And what it does is tell Sergeant First Class Chafin that he can't remove the child. There's no prohibition to the mother. There's no sense that Scotland has assumed authority over this child. She's become a ward of the country. It's more that since the mother has filed a custody action there, it's a, Dad, you can't remove the child from Scotland. It's a standstill order there. Yes. How long has the child been now, since the return, pursuant to the Federal Court's order, how long has the child been residing in Scotland? October 13th of last year, I believe. So approximately 14 months now. Well, if the Alabama courts were to conduct a custody proceeding, since the child has now been in Scotland for over a year, would they consider the child's habitual residence to be Scotland? The Alabama courts understand that. And if they did that, would they defer to the Scottish courts' custody determination? No, Your Honor, I don't think so. Again, applying UCCJEA, which all the States have, but for one, they would look at Hague orders in the same way that they would apply UCCJEA. And there's a tolling provision. If a child has been wrongfully removed from that jurisdiction, then the child is still presumed to have retained a home State status with Alabama. Sotomayor, there's a judgment against your client, isn't there, for $94,000 or so? Yes, Your Honor. Could you break down that figure? The lion's share of it is attorney's fees, but also within the Hague there's a mandatory provision for costs, not just cost of court, but the cost of mothers flying over here from Scotland, staying here for approximately a week in a rental car. So while that isn't the predominant share of the $94,000, it was a substantial portion of that. So that is still at stake? Have State proceedings been dismissed or are they in suspense? Neither, Your Honor. Where they are is the trial level court is waiting to grant a divorce, but that is kind of effectively held up by the parties in hoping that we can use Alabama rule of civil procedure 60b-5, that if we get a reversal from the Eleventh Circuit saying habitual residence is the United States, we can reopen the custody. So it would be your position that the Alabama courts still have jurisdiction over the child and the mother? Certainly if the Eleventh Circuit reverses, yes, sir. Yes, Your Honor. Counsel, that cost that you have to pay for the mother, even though the case was mooted, that judgment is still outstanding for the monies you have to pay? It still is, Your Honor. If you win on this appeal, is that wiped out? We believe that it is. The energy of our case is thrust into having habitual residence determination reversed and bringing the child back. But we think that when the provision of ICARA that allows for the cost, the travel cost and the attorney's fees to be awarded, is also obliterated. So that is also wiped out. Was that done in a separate judgment? It's a separate order, same case. And is there any problem about the time to appeal from that, having won? We don't think so. But, again, that's not the thrust of our case. I understand the government's argument, and we certainly agree with that. Our energy all along has been spent exclusively on reversing the habitual residence determination. But as far as mootness is concerned, if you have not appealed from that order and the time is run from your appeal, you can't rely on that to avoid mootness. Your Honor, I believe I understand your question. And I think you're correct if we're talking about a determination that the United States loses power over children when they're removed from our borders, then the rest kind of falls in line. Counsel, what's in this? I don't understand your answer. I'm sorry. I don't understand that answer. Are you saying that your failure to appeal that in a timely fashion makes it impossible for the court of appeals to obliterate that award? No, sir. And it may be. That's what I thought the question was. I apologize. And it may be just the tunnel vision that we have in this case. We're solely focused on reversing the additional court order on habitual residence and returning the child. The rest is a great deal. Well, then retain your tunnel vision and don't say that the case remains non-moot simply because of this other issue. The other issue is either in the case or out of the case. Now, is it part of your case? We agree with the government's position that it keeps this case alive and is not moot, but I certainly understand the issue, particularly since our focus on the case is otherwise. Well, if you could have taken appeal and got a reversal of the decision of the order removing the child to — allowing the child to be removed to Scotland, wouldn't that undermine the judgment for costs? And I don't understand why that would be a separate order, why that would be something that has to be appealed separately. Why wouldn't that be included with the final order in the case? Yes, Your Honor, I agree. I mean, the — allowing the child to leave was the linchpin that allowed the costs. Removing that impediment also removes the costs. Well, I mean, that's lovely. So you are saying that you don't have to appeal that separately. Is that what you're saying? I'm saying I trust that that is the resolution of this, but, again, our focus is on the child, not — But you've got to answer my question. Yes. Do you have to appeal that separately or not? If the way you answered Justice Alito's question was the way you did, you are saying that it's unnecessary to appeal that monetary aspect of the judgment separately, that it goes — it goes with the rest of it. Is that — is that your position? Your Honor, I think that it is correct that if the basis for the award is removed, then the award is removed. But if the basis for the award remains, then it would be difficult to assert that there's some reason to appeal that award. I don't think there's any great answer to that. I think you're saying it doesn't have to be appealed separately. Yes, sir. Yes, Your Honor. Tell me what's happening. What is the status, given the vacated return custody order, return order? Will the Scottish court ever determine habitual residence? The Scottish court has no need to determine habitual residence because that was determined by the district court. But that order has been vacated. So can they revisit that question is really the issue. I don't — they wouldn't revisit within the context of a Hague proceeding unless a Hague proceeding were brought there. Within the context of their own custodial determination, like the Alabama court would in the divorce, there is a determination of jurisdiction over the child. But you could bring a Hague proceeding there, right? We could bring a Hague proceeding there. You could say, you know, there having been no decision in the United States, we want you to decide what the habitual residence is and we think it's the United States. You could do that. We could do that. The problem with that is that we're talking about different points in time. For our Hague proceeding, actually it's the mother's Hague proceeding. She's the one that filed it. For the mother's Hague proceeding, the time period that we're looking at was February of 2010 until the child left in October of 2011. That is a time frame we'd really like to stay with. That's an important time frame. If we go to Scotland, we're talking about a different time frame and it's in a different animal. I thought you said that that time period was told, the period that she was in Scotland would be told. From a United States perspective, more specifically an Alabama perspective, yes. Yes, Your Honor. But in Scotland, it would be a custody proceeding. We forget about the Hague. The child is there. The mother is bringing a custody proceeding. And the question for that Court is where is the child's habitual residence now? And at the Hague, it's what was it then? Yes. Yes. And the Scottish court, our briefs are filled with the citations of authority, but the Scottish court, there's no reason to believe the Scottish court wouldn't honor what the United States court has said about habitual residence, a case brought by the mother in the Federal District Court in Alabama. So if that was a linchpin that allowed it. But that was only for determining the Hague Convention. And if the Hague Convention is out of it, then there's a custody proceeding. The idea of the Hague Convention is just to get the case to a forum that's an appropriate forum to decide the custody question, right? Yes. Custody is the second and crucial element of the Hague Convention as well. If there are no further questions, I'd like to reserve the balance of my time. Thank you, counsel. Mr. Harsky. Mr. Chief Justice, and may it please the Court. Put simply, this case is not moot because an appellate decision on the merits would matter. What the Court has been discussing today is there are various ways in which the appellate decision might matter. There are ways that there would be a judgment that the father either did or did not wrongfully retain the child. Part of the wrongful retention determination is the $94,000 in money damages. There's a question of whether the child might remain in the U.K. or be brought back to the U.S. And then there's the question of which courts are going to decide custody, Alabama or Scottish courts. And we don't need to know precisely, and this Court doesn't need to figure out all of the different details of Alabama State law or of custody law under the Scottish proceedings. All the Court needs to decide is that the appellate court decision would make a difference here. And it's just not the case that you could say it's moot because it doesn't make a difference. Scalia Well, we don't know it will make a difference without answering those questions. You want us to say it might make a difference and that's enough, right? Saharsky Well, this Court has said that as long as there's any possibility of effectual relief, that the case is not moot. Scalia Well, you should put it that way, then. It doesn't — you don't know that it makes a difference, but you don't have to know, right? Saharsky That's what I would say, is that you don't have to know. But just if there is nothing else but a declaratory judgment that the father either did or did not wrongfully retain the child in the U.S., that is a piece of paper in the world that has consequences to these parties. It has consequences in terms of the money judgment that's been entered, and it has consequences in terms of where custody will be determined. The whole point of bringing a Hague Convention case is to get the child in the place of habitual residence so that those courts, under their own law, can decide custody. Ginsburg Ms. Saharsky, not to — I mean, the whole object of the Hague Convention is to stop this shuttling the child back and forth. But because of this unfortunate situation we have where the district judge wouldn't give a stay, what you're urging is exactly what this convention was meant to stop. This child has been in Scotland for 14 months. Now you say bring it back to the United States and we start over. The whole object of the return procedure is so that you get the child to a place that's a proper place to determine custody. Isn't that right? Saharsky Yes. We share your concerns about not wanting the child to be shuttled back and forth. And we think that the way to accommodate those concerns are by stays in appropriate cases where the four-factor test with respect to a likelihood of success on the merits and a balancing of the equities is met, and that when stays are put in place pending appellate proceedings, that those proceedings be expedited, that decisions made quickly. Kennedy And would you go further and say that if a stay is not in place, that that still does not deprive the court of appeals of jurisdiction to resolve the case on the merits? Saharsky Yes, that's what we would say, that the case is not moved. The court of appeals should be able to go forward with the case. But if the case for a stay has not been made by the losing party, then the child should be returned to the country of habitual residence because a determination has been made that that's the country where the child should be, and there's not a good argument that the other side has put forth for a stay. Ginsburg You said the ideal procedure would be, and I quite agree, that you have a very fast-track stay pending appeal and expedited appeal, but there's no rule that requires that. So how could that sensible procedure be put in place? Saharsky Well, we think that just under the normal court appellate rules, that that effectively is what happens using the American stay standard for a four-factor test, not that there would be a stay in every case, but when the showing, the appropriate four-factor showing is made for a stay, that then a stay would be appropriate and an expedited appeal would be appropriate. Scalia Well, that's lovely, but there wasn't a stay here. So what do you do when that procedure hasn't been followed? That's the issue that we're presented with. Saharsky That's exactly right. Scalia And do we even know that a stay would have been appropriate here? Saharsky Well, the district court denied a stay and Petitioner did not go to the court of appeals, so we don't know. Scalia Well, that's the case, but this decision actually went to the court of appeals and the court of appeals reversed on the merits. It would be up to the district court on remand to determine how to fix its prior erroneous decision. And it would use the equitable authority that it has in every case to fix a wrong decision and determine what the right thing to do is. Ginsburg But we wouldn't go back to what should have happened, that is, the district judge applying the four-factor test, or did the district? There was an application for a stay. It was denied, right? Saharsky  Yes. And the district court entered a brief order, so the district court did not go through the various factors, but presumably that is the standard the district court would have used. Sotomayor Could I ask a question? Does it matter? Meaning, whether a stay is granted or not, you are, I don't think, taking the position that only if a stay is granted is the court of appeals seized of jurisdiction. You're saying the case is not moot, correct? Saharsky That's exactly right. The mootness question and the stay questions are two separate questions, and you don't want to have to say the person has to get a stay in every single case, otherwise their case becomes moot. They're appeal. Sotomayor All right. Now, under the convention, if the child goes back to the district court now to fashion a remedy, it could order return, it could decide under the convention that bringing the child back after 14 months presents a great risk to the child under the convention and not order the return, correct? Saharsky We don't think the convention addresses that, but the district court could make that determination using its equitable discretion. Sotomayor So we just don't know what the court's going to do, but some form of relief is possible. That's why you use the word possible, which is? Saharsky That is exactly our position. We don't know what the courts would do. We're glad to discuss the possibilities with the court, but the standard is the possibility of relief, it doesn't need to be completely. Sotomayor But they have the power if they choose it, but they don't have to choose it. That's the bottom line, correct? Saharsky That's exactly right. The position of the other side is that there's absolutely nothing that the courts can do in these circumstances once the child leaves, and we just think that the convention doesn't say that. It doesn't mandate that. It's a question of U.S. mootness law, and this Court has said as long as there's no mootness law, there's no way to do anything. Sotomayor Are you aware of — I happen to be because I know this area very well — the English courts had an amici filed with us yesterday, and they are sort of sensibly keeping track of what we're doing and trying to adjust their proceedings accordingly. And in the manner they think is most helpful to us, whether it is or not, I can't comment on. Is this common in the custody area? Is there discussions between courts about what they're doing and the why of it? Saharsky Well, in the convention, there's kind of two aspects of this. One is in child custody proceedings under the UCCJEA, and one is in the context of the convention. The UCCJEA, which deals with competing States and potentially competing countries, custody determinations has specific provisions that address cooperation and communication. They are like section 110, 111, 112. Sotomayor And it's required. There's a whole system set up. Saharsky There's a whole system for that. In the convention, that type of comity and cooperation typically occurs through the central authorities. Each country has a central authority that communicates with each other. So, for example, if the U.K. central authority would like something to be brought to the U.S. Court's attention, it might enlist the help of the U.S. central authority in, for example, getting the parties to agree. Scalia Well, that's very nice. What does that have to do with this case? I don't understand that. Saharsky Well, the question is just what might happen in this case in terms of if there would be competing court orders or whether the courts would, what the courts would do in response to each other. And I think the point, at least, that I was getting from Justice Sotomayor's question is that there is a measure of cooperation here, so that the Court need not be particularly concerned about parallel proceedings or competing proceedings in other countries. The way that, for example, this case has played out is that while the Hague Convention dispute has been litigated in Federal court, the Alabama custody court has appropriately stayed its hand, as it's required to do under Article 16 of the Convention. Roberts Counsel, do you agree with your, with the Petitioner, I'm just reading a sentence from his brief, that mootness requires that relief be impossible? Do you think that's the right standard? Saharsky Well, we understand, we think that the Court essentially said that in Knox, that it said, that asked whether there's a possibility of relief. If the question is one of literal impossibility, we don't think that the Court needs to ask. Roberts But what this Court has always said, it's an Article III inquiry understanding, and it said that it's not supported by injury that is speculative or conjectural. It seems to me when you start talking about, well, the Scottish court might do this or the Alabama courts might do this, that sounds pretty speculative and conjectural. Saharsky Well, I think the Court has made those comments more in the context of the standing inquiry at the beginning of a case, as opposed to the mootness inquiry after a case has gone on for a while, and the burdens there are different. At the standing, at the beginning of a case in the standing inquiry, the party coming into court really has a burden of showing that this case, that there's something to be adjudicated in court. As the case continues, it's the party who doesn't want the case to be in court anymore to show that there's nothing the court can do, that even though the Court has put those resources there. Scalia Well, the burden is different, but I don't agree that the standard changes. It's just who has to prove it, one side or the other. Saharsky Right. And our position with respect to the standard is simply from language taken from this case, but also repeated in Church of Scientology and Knox, is there any effectual relief, whatever? Is it possible to grant relief? Relief can be partial. It doesn't need to be complete. That's things that the Court has said. You know, we don't interpret that to be a, you know, literal impossibility standard. We just understand that to be asking the question, is there something the courts can do, even if it's not complete? Roberts So do you think it's — I mean, I know you've got a laundry list of things, but as I understand it, you think it's enough that if the Court issues an opinion, the Scottish court might do something as a result of that? Saharsky Well, I think that the court issuing an opinion has effects in America, regardless of what happens in Scotland, because you have a declaratory judgment that sets out the rights of the parties. Roberts But one of the arguments, and maybe it was the Petitioner's and not yours, was that one reason it wasn't moved is because the Scottish courts might look at the case differently. Saharsky Well, that's — I think it's a set of interrelated reasons. I mean, they're really all connected because — can I finish this sentence? You have a judgment in the United States about the rights of the parties. It affects the money judgment. It affects what might happen with custody. I mean, it's all part and parcel of the same dispute. Roberts Thank you, counsel. Mr. Cullen. Cullen Mr. Chief Justice, and may it please the Court. Mr. Chief Justice, the effect that any appeal court could give would be zero in the Scottish court. Nothing. There is nothing a court can do in this judicial process. Sotomayor Why can't they order the mother to come back with the child? Because the Scottish court stops her? There's competing orders all the time. Cullen Which — well, they can't, first. The answer to that is no, they cannot. Sotomayor Why not? She was here. She submitted to the court's jurisdiction. Doesn't her jurisdiction over her now continue until the end of the case? Cullen Well, the case did end because there's one remedy, and one remedy only in this treaty, and that is return. Sotomayor That doesn't matter. The question is, isn't she seized? Doesn't the court have jurisdiction over her until the case ends? The case doesn't end until there's been an appeal and a judgment, and the judgment affirmed or reversed. That hasn't happened. Cullen No, that's not correct. I can't agree with that, because then we're ignoring Article III and the constitutional doctrine of mootness, because that's where the constitutional doctrine comes into section. Sotomayor You are suggesting that the Convention deprives a party, after the remedy has been ordered and effected, of the right to appeal, not because of mootness, but because the Convention takes away a fundamental right to appeal? Cullen No. The Convention says you must exercise the most expeditious remedies available, because we're doing that. Sotomayor You're not going to suggest all those countries that permit appeals explicitly and stop removals until appeals are finished, that those treaty – contracting treaty parties are breaching the Convention, are you? Cullen No, they're not. There are 88 countries, and this is a very, very good Convention. It works. It works for the countries, Justice Sotomayor, that do immediate enforcement, and it works for the countries that don't do immediate enforcement pending an appeal. But the question presented here is what a court could do in this country once the sheriff court in the hamlet of Airdrie is seized with jurisdiction, because what this the United States and said, Scotland, you now have jurisdiction. Roberts One thing the court can do is give him back $94,000. Cullen Cannot. Cannot. I was very— Roberts He has no – his ability to challenge the propriety of the order that he pay $94,000 is gone? Cullen It's gone in this case, Mr. Chief Justice, because in the joint appendix, pages 16 and 17, you'll see, I believe it's docket entry 52 on page 16, an appeal was taken off those fees. If you go on, I believe it's page 17 of the joint appendix, docket entry 57, you'll see that the petitioner voluntarily dismissed his appeal of the fees. So having taken an appeal of the fees and having dismissed – there's nothing left for any appeal court now to do with respect to fees. Kennedy Well, except he might have assumed that the issue of fees would still be alive if the Eleventh Circuit ruled on the merits. Cullen Right. Kennedy He was just trying to have a single appeal. Cullen Right. But the test that the court would apply in that hypothetical fees determination is totally different from the test the appeal court would apply in looking at habitual residence. All it would look at is, is it— Kennedy Well, appellate courts all the time have issues where they apply different standards to multiple issues in the case. Cullen Right. So if we assume that the fees survives, they can pursue the fees issue. The problem, Justice Kennedy, is that there is no habitual residence to be determined back in time. What this treaty does is it exercises a one-way return. Kennedy Well, that, of course, on your premise, that's right. On their premise, that's wrong. The issue of custody is still alive under their defense. So that's what we're arguing about. So you're just assuming your own premise. Cullen Well, the premise, though, is based in the purpose of this treaty. Because back in the 70s, before this treaty, Justice Kennedy, there was chaos. And, in fact, the government is suggesting we should go back to possibly competing custody orders between Scotland and Alabama. But— Breyer I don't think that's the—you've won a judgment in the lower court that says the habitual residence of the child is Scotland. So if they appeal, they might win one that says that was wrong, the habitual residence was the United States. Now, the child's in Scotland. You understand Scottish law better than I, but they're also bound by this treaty. So I would imagine a Scottish court, just as we would do, when they're trying to decide what's the habitual, because it's up to them now what's the habitual residence, they would look at what the United States courts decided. They're not absolutely bound by it. But just as we, in the last case we had, were very interested in what the Chilean courts said. Of course it was relevant to us what the Chilean courts had held was the proper law of Chile in respect to that child. Wouldn't the Scottish courts do the same? Wouldn't it matter to a Scottish court, after all, that an American court had decided the residence was not bound? I'd certainly give it — won't they give it consideration? With — Justice Breyer, with respect to the lower court's opinion, there is, as Justice Ginsburg said, there is no opinion. There is nothing. There's no opinion. I'm assuming they win. The reason that they want to appeal is they want to win. If I were looking at the cases you presented, I would say, of course you'll win. Don't worry. What are you worried about? But, but, they have a different view. So they think they're going to win. Now, it means nothing if they lose, but if they win on appeal, they then have their order that says that this child's habitual residence was the United States. And my question is, were we started armed with that piece of paper, they walk into the Scottish court and they say, oh, Scottish judge, please read this paper. Of course he'll read it. And I would think that that judge would take it into account in his decision. That's what we do. With the foreign — similar foreign orders of other foreign courts. And I think we should do that, and I think the Scottish courts should and will. Now, you tell me where I'm wrong in that. Justice Breyer, the sheriff in Airdrie would say, why are you handing me a finding about what habitual residence was two years ago? The child's habitual residence two years later is clearly Scotland, and we don't look back in time with respect to that. Or the argument as to why they shouldn't give in to this hypothetical American judgment. That isn't my question. My question is, won't they consider it and give it? And the Scottish courts, to my knowledge, are not so narrow-minded. I think they would pay attention to what other courts have said. Am I right or wrong? I want to know if I'm right or wrong. Ginsburg We have a brief in the case telling us that the question Justice Breyer is posing, would they look at it, they would say it's irrelevant, because what her habitual residence was then doesn't matter one whit to us. We want to know where she is residing now. And that's the reason why the Scottish court would say it's not relevant to the question before us. Their question is not a treaty question. Their question is custody of this child. Roberts Justice Ginsburg, that's correct. Justice Breyer. Breyer Thank you for Justice Ginsburg's answer. She is quite helpful. I thought he had said the same thing, that the reason that was there was that I didn't understand it as fully, and now I do. Roberts And Justice Breyer, I'm quite surprised that you would say that prior residence can never bear on present residence. In custody disputes, this happens all the time. The child spent five years in this country, four years in that country. Now for the last two years, the child's been in this country. The previous experience of the child has a tremendous bearing on custody. To say that it's only now, prospective only, after the child has been removed, I just think is wrong as a matter of custody law. Roberts With respect to custody law versus Hague law, Justice Kennedy, there's a difference. The relevance of the Hague determination two years in the past is not, Justice Breyer, helpful, but I agree. Breyer Unless there's some accommodation here, what worries me is this. If you win this case, it's not going to be better. Maybe for your client it will be, but for others in your position, it's not going to be better. And what's worrying me, to put it on the table so you can respond, is that in similar situations, district judges will think this child belongs in England, this child belongs in France, this child belongs in China, wherever they belong, but, in the back of their mind, will be the possibility that they're wrong, and they know there's a right to appeal. And so instead of being able in these border cases, borderline cases, instead of being able to say, I've got to keep the child here so that the other party has the right to appeal. Now, it seems to me, in general, that would be bad for the child, it would be — and it's bad for our system. And it would be better to work out a system that you can send the child back, and then, if you're reversed on appeal, it does matter to the other country's courts. Roberts Justice Breyer, we say, as you know, you can't have conditional returns. But you can have, with respect to stays, there are a panoply of different types of stays. Now, what happened in the district court in this case? Counsel, that actually is not accurate. The Convention's full of conditions for the return. The safety of the child, the support of the parent who's returning. There's a whole set of conditions that have to be met before the child is returned. Justice — I happen to think, or that one could argue, that returning back to the court that had — was making the decision after an appeal is raised, that that's an inherent condition of a return order. But that — you're arguing against that, but there are plenty of conditions that can be imposed. We don't — we don't agree with that, Justice Sotomayor. There are affirmative exceptions that can be asserted by a Respondent. But there are no conditions — in fact, Article 19 of the treaty, as you know, says you cannot, as a Hague court, step into any sort of custody determinations at all. No, you can't — the court can't order custody issues, but it can set conditions for the nature of the return. It could say the father pays the cost, the father has to pay for certain expenses in the country the child's being sent to. Those kinds of conditions can be imposed. Those would be limited undertakings. As you know, Justice Sotomayor, those limited types of undertakings came about because of the 13b exception, and the 13b exception only, where a judge felt there was some risk in the return, but the risk did not rise to the grave risk. Mr. Cullen, it's often true in international litigation that enforcement is very difficult. I mean, take a commercial litigation case where somebody is going after assets, and the assets are not in the United States. And somebody looks and says, well, you know, a court can do whatever it wants, but nothing's going to happen afterwards. So why is this case any different from, you know, a very frequent problem in international litigation, which is sometimes judgments are difficult to enforce. And if you look at it practically, may never be enforced. But we don't put courts to the job of saying, oh, well, let's check out the various enforcement options and make predictions about who's going to do what. Justice Kagan, not to state the obvious, but this is different because it's a child. It's a child, a question, and that has to be a consideration in this case. Well, it's different. It might be. It's certainly different in terms of the interests at stake, and that might be a very good reason for Congress to step in and try to fix this system so that you don't have children shuttling back and forth. But, you know, at the risk of sounding hard-hearted, in terms of the law, what is different? Well, what is different is, and I need to answer the question, two justices have asked me about these stays, and I need to answer that so I can answer your question. The district court was presented with a single request for a stay in this case. The request was, we may or may not file an appeal. We haven't filed a notice of appeal, so give us a stay so we can decide what we want to do. What should have happened and what usually happens is you say, give us a stay, but if you're not going to give us a stay, give us a temporary stay. Give us 48 hours to see if we can get a stay from the appellate court. Well, that's not quite fair to say we haven't decided whether we're going to appeal. I mean, the stay motion was made immediately upon the determination of merits by the district court, and the district court said, nope. So I mean, didn't they do everything they could have done to get a stay? No. It was a peculiar, half-hearted request for a stay. The stay was, we don't even know if we're going to appeal this. Well, that's out of respect to the district judge, who's just issued a ruling on the merits, I mean, saying, you know, we have to consider your ruling, not, you know, we're taking you up right away. Right, and this was a Wednesday, and what should have happened is, at a minimum, a 24-hour or 48-hour request for a temporary stay, and Mr Chief Justice, this happens all the time in Hague cases. Hague practitioners ask for stays, and if a stay is not going to be granted, ask for a temporary stay. The notion presented to this court, that there was some rush to justice here, is not what we want to see in Alabama. That is not what we want to see. Roberts. It seems to me, and I may be taking the opposite position from one of my colleagues, but the best thing is to hold things up briefly so that the child doesn't go overseas and then have to be brought back, particularly if you have situations where there can be an expeditious appeal, and I think most appellate courts would appreciate the benefit of that. But it seems to me if you, if you're correct that the decision is moot, it's not going to be a, there is going to be a rush to judgment by the individual that wants to take the child away. No, we don't agree with that, Mr. Chief Justice, because that doesn't take account of the four factors any district court judge is supposed to exercise in her discretion in determining whether a stay should be granted or not. Well, again, you're just assuming that the district judge is right, but that's the whole issue. And as the Chief Justice indicates, under your position, we give a premium to the very sort of precipitate action that the Hague Convention is designed to avoid. Justice Kennedy, no, what we're doing is we are following the letter and the text of the convention and the implementing legislation in this country. Time and again, this peculiar word forthwith is used. It means right now. Time and again, the treaty tells us you must act expeditiously because the idea, Justice Kennedy, is we avoid competing litigation in countries. We must have one country that is deciding this. And it's— So are you arguing that the effect of the statute implementing the treaty, which uses forthwith in all of this, is to, in effect, require that unless there is a motion for a stay pending, the decision of the trial court be carried out? Yes, Justice Scalia, but— You think the mere word forthwith in the statute is enough to alter our normal process of appeal? It's the — it's a treaty, it's the supreme law of the land, it says if you decide to issue a return, the child is to be returned forthwith, and the plain meaning of those words is you must act immediately. But I can't — I don't understand why you want a treaty where the best interest of the child is what's at issue, and you interpret it in a way that the court of one nation with the child, where you have parents from both nations, pays no attention at all to what courts in other nations are saying. I mean, my experience out of that is Chile, where of course we wanted to know what the law of Chile was and how the Chilean domestic relations judge understood the relations between the parents. That was important. And similarly, I think the Scottish judge should want to know the same thing about the courts deciding in the United States. And the same thing is true of the United States judge wanting to know about Scotland and so forth. I don't see how we're going to get harmony in other words unless you let appellate processes go forward, too. And I don't know what the treaty drafters would have had in mind if they wanted some other regime. Justice Breyer, it's not that we enter into these communications and agreements with any country by ratifying this particular treaty and by the United States saying we are going to ratify it with the United Kingdom or Scotland or Brazil. We are saying much more than there's no comedy here. We are saying we trust this other country to do the right thing. And that's, Justice Breyer, why we lodged the Scottish papers. Because the Scottish papers should satisfy you that Scotland was very satisfied there was a valid return. I trust Scotland to do the right thing. And I think to help Scotland do the right thing, it would be nice for Scotland to know what American judges have decided. That's all. And the reverse is equally true. But it doesn't matter, Justice Breyer, because there's been a vacator. There is no underlying decision. The child is back in Scotland. And now one court can proceed. And in fact, by continuing, Justice Breyer, by continuing the litigation, the effect of that is to undermine the treaty. Because the idea behind the treaty, particularly for military families, was to enable mobility. And by having ongoing litigation in the United States, the only thing we can guarantee this court is this child is not coming to America until the litigation is over. So now we're talking two, three, four years. Sotomayor, excuse me, can I just ask? Kagan, may I ask? I'm trying to figure out what exactly your argument is. So let me give you two options, and you tell me what your argument is, all right? One, you can tell me it's neither, I suppose. But one is this case is moot because there's no practical way to enforce any relief that's ordered by the Eleventh Circuit, all right? That's what I came in thinking your argument was. The second is, it's just no, it's just improper for the Eleventh Circuit to enter any order granting relief. So which is it? Is it that it's improper to enter any order at this point? Or is it you can enter an order, but it's just not going to be enforced, and therefore this case is moot? Justice Kagan, I'm going to take your third non-offered offer. And the answer is, because the Constitution tells us there is no case. We cannot, we cannot, and I see Justice Alito. I don't understand the third option. Because Article 3 says we have to be able to grant some effectual relief in the judicial process. And since the Mills case in 1895, right up to the Knox case this year, this Court has always said it's effectual relief in this judicial process. So I have to pose the question, Justice. Alito, then you seem to be saying that if the law does not permit the issuance of a particular kind of order, and that's what the plaintiff is seeking, or that's what the appellant is seeking, then the case is moot. Is that your argument? I thought that's a merits question, not a mootness question. It is a mootness question, because it goes to the heart of constitutional mootness. It goes to the issue of this may be uncomfortable, and this may be inconvenient. But once we've effected a remedy, the only remedy, Justice Alito, under this treaty, and once it's been carried out, and once that child is home in Scotland, no matter what another court does in this judicial process, it can have no effect on the Scottish custody of a child. Mr. Cohen, are you saying that under the treaty, there can be no re-return order? Is that what you're saying? Whether the return order was wrong or right, there can be no re-return? There can be no re-return. There was a lawful order returning the child to the jurisdiction of Scotland. And there can be no re-return by the terms of the treaty. So this is an argument that hangs on what the treaty's terms say. Is that correct? Well, it is very textual, which is, of course, what surprised us so much in the government's position in this case. Because, as you know, Justice Kagan, in the last time the government presented this position, they said exactly the opposite in Janakakis. Now, they tried to deal with this, Justice Kagan, in this footnote in their brief, saying, well, we touched briefly on this point before. They didn't touch briefly on it. They said, in absolute terms, that nothing in the Convention— so this is our government talking about the text, and we may give some compelling deference to the government on text, but we don't give any deference to them, we say, on what the Founding Fathers meant. But with respect to this Janakakis case, the government said, nothing in the Convention requires courts or other authorities, and this was in Greece, to give binding effect to any judgment. Breyer. It does, but wait. Now you've got me, I think, on the same wavelength, and I think it was back in 2012. Let me see, because, Justice Ginsburg, I see the point of her answer now. It's really fact-specific to this case that you're talking about. So it just happens that the child has now been in Britain, or in Scotland, for 18 months. And so the question of current habitual residence, where they've been there for 18 months, is a question of what's been happening over these 18 months. And what happened before the 18 months has absolutely nothing to do with it. And the most that the court of appeals could say is that it was resident in America 18 months ago. And that's no more relevant than saying that the cow jumped over the moon or some other thing. It has to do with, is that the point? Is that the point? Is that the point? If that is the point, yes, that is the point. Okay. If that is the point. Roberts. It is the point because the Convention says it's the point. Well, the Convention doesn't know whether it's 18 months or 6 months or what counts as habitual residence, does it? The Convention says you look to the place where the child was located immediately prior to that. That is true, but you have to decide whether that's the habitual residence. And it seems to me you're adding a factual thing, that what happened 18 months earlier has nothing to do with whether the child is now an habitual resident of Scotland. And what I want to know, and I'm not going to find this in the treaty, I don't think, because it's not going to say whether it's 11 months or 12, but I want to know what source I look to to show that you're right and that what happened 18 months previously has nothing to do with the child's habitual residence as of the place where he's lived for 18 months. You look to 1895, you look to the Mills decision, and the Mills decision that tells  me that the case is moot when the issue presented are no longer live and the parties lack a legally cognizable interest in their case. The live issue of habitual residence 18 months ago is dead. Roberts, so everything turns, under your view, on whether or not the district court gives the losing party a 48-hour stay or whether the mother in this case decides to stay in the United States until the U.S. proceedings are done. The incentives, if you prevail, are for the custodial or the parent with control over the child to leave immediately, even after a motion has been filed. If a motion for a stay has been filed, that's not a stay. Get on the first plane out and then you're home free. That seems to me to be a very unfortunate result. Mr. Chief Justice, we don't agree, and here's why. We don't agree because initially the district court judge did not order the instantaneous departure of this child. She only did that after considering the motion to stay. It was not— No, no. I know. But the point is that the other side says that the decision was wrong. And— I mean— Right. And, you know, most, I don't know most, but many district judges don't like to immediately say after they've issued a decision, well, there's a good likelihood that I'm wrong, and therefore I'll issue a stay. So there has to be at least a period before somebody can go up to the court of appeals and get a stay. And if you're right, what's happening during that 48 hours or 24 hours is that the parent with control of the child is trying to find the first flight out, and once she does, it's all over. It is all over. Once the doors close on that plane and that child arrives back in Scotland, unless the plane turns around and comes back again, it is all over. Well, I understand your answer to Justice Kagan. Your argument is dependent on the proposition that under the Convention, once the child has left this country, a U.S. court no longer has any power to order the child to come back. Is that right? Yes, Justice Alito. And I don't see where that was decided either by the court in this case or in the Beckyer case that the Eleventh Circuit panel here cited. There's no discussion in either of those opinions of the how the Convention – what the Convention says on this question. The Beckyer case goes back to Mills and relies on Church of Scientology. No, no, this is not a question about our general standard of mootness. This is a question of the meaning of the Convention. As I understood your argument to Justice Kagan, your position is dependent on a particular interpretation of the Convention. And I don't see any discussion of that interpretive issue in either of those opinions. Well, this is the – this is what makes constitutional mootness uncomfortable, because it's an answer that justices and judges typically don't want to hear. But it is the answer. The answer is there's nothing left to be done. The one remedy has been effected, Justice Alito. And what brings all this into sharp contrast now is what we lodged last week. The Petitioner, Justice Alito, himself, is fully participating in the Scottish Petition. If the Convention said explicitly that a court in this country or whatever other sending country is involved could order the child back, this case would not be moot. Is that correct? Yes. And you – but you say that the Convention, in effect, says exactly the opposite. Once the child leaves, there can't be an order requiring a return. Right. And there would be a problem, Justice Alito, if we didn't have the motion to stay concept, if we didn't have all the alternatives for district courts to enter different types of motions to stay. And what at least will happen from the Chafin case, I'm sure, will be everyone will know that you need to ask for a motion to stay, everyone will know you need to ask for different types of motions to stay. But asking is not enough, because the mother can get on the plane the moment she hears that someone's asked. No, the mother can get on the plane when she's allowed to get on the plane. And in this particular case, probably because she had to come in under humanitarian parole, there was considerable urgency in this case. And it was a very young child, and the Scottish court was ready to be seized with jurisdiction. Why would Judge Johnson not do what the treaty was telling her to do? Get the child back to Scotland. I've found the habitual residence in Scotland, and let's let Scotland move forward. Thank you, counsel. Mr. Moneli, you have four minutes remaining. Thank you, Your Honor. With that, I'd like to touch on four points. First of all, these courts have inherent authority to order the child be brought back. It is a way of reversing the wrong decision of the district court. When we're talking about the object of the convention, it is in part rapid return, but that is kind of putting the cart before the horse. The critical issue is where is the appropriate habitual residence of the child, and that is the place that then needs to make the decision. What he says is that in — after 18 months in Scotland, the Scottish court will decide where is the habitual residence of the child. We're now in August of Year 2. And what happened before January of Year 1 is now totally irrelevant. So even if the American courts decided prior to January of Year 1 the correct habitual residence was Alabama, when the Scottish court decide what is his habitual residence as of 18 months later, they won't pay any attention at all to that American decision because it is not relevant. That, I take it, to be his argument, which depends on the long time, 18 months. So what is your response? I think that may well be his argument. I disagree with it entirely. As was pointed out earlier, courts are quite used to having children have to transfer from one place to another. The closest case I'm pointing to, I think, of— But that was the purpose of the convention, was to cut that out. That's the whole reason for the convention, that they wanted to stop the shuttling of children. And do you — are you aware of re-return — I mean, your thesis is that the — that now the court of appeals could tell a district judge, you were wrong, and then the father, armed with that, can go and get a re-return order from the Scottish court under the convention? Have there been instances under the convention? Was this question of re-return, is re-return authorized, assuming that there was a valid return order, at least valid when it was entered and when the child was returned? What is the incidence of re-return under the Hague Convention? There are no cases because we don't run into this problem, quite frankly. And re-return is a catchphrase that was created here. Bringing the child back would be part of the court's inherent authority, part of the district court or the court of appeals' inherent authority, and it's the basis upon which Scotland has the child in the first place. Sotomayor Isn't there a Spanish case? I'm sorry? Isn't there a Spanish case? There is a Scottish custody case. Not a Scottish, Spain, a case from Spain. A Spanish case, yes. Where the child was, in fact, returned when. The child was sent to Poland based upon the trial court's decision in that case, and the child was returned from Poland based upon the Supreme Court of Spain's decision in that case. So it's a confusion between. Ginsburg Was the child returned or was it just a decision that the appeal could not be avoided? Was the child returned by Poland? I don't know, ultimately, if the child was returned from Poland so much as the court. Ginsburg That's the whole problem, is you're going to have rival decrees of two countries, which is what exactly what the convention was meant to avoid. Except that we never have. I mean, this is a fairly young convention and we haven't had it that long, but we never have had that problem before. It's been easy enough, Olander v. Larson. Now, the Tenth Circuit is a great case to look at for where the United States has been very giving in sending children back. We have not had this problem. Sotomayor Counsel, there's an amici brief here that says that the Scottish courts will not pay attention to the habitual residence of a child at the time of the re-removal. The amici brief that was filed with us yesterday, if I'm reading it correctly, suggests that the Court believes that hasn't been settled in English law. Is that correct? Verrilli, That's my reading of it as well, Your Honor. Sotomayor That's so that proposition is not as settled as the amici suggests. Verrilli, Correct. I think they're waiting to see what we want to do. So you've got Villamonte v. Marquez, where the issue there is it's not moot because it's possible an extradited person could one day voluntarily return, so it's not moot. But in this case, there's nothing preventing the mother who filed the case for the district court and is still a party to the case from voluntarily returning. That enough to survive is enough to survive. Roberts Well, that sounds awfully speculative and conjectural. That doesn't sound, whether you're analyzing it, understanding it, a first instance or mootness later, that doesn't sound to be the sort of concrete injury that's required. Verrilli, The concrete injury has to do with that habitual residence determination in the district court, which switches if the appellate court reverses, and grants habitual residence here and orders the child to be brought back. That is the concrete injury. Thank you, counsel. The case is submitted.